CRAIG A. PINEDO, Cal. Bar No. 191337
cpinedo@pinedolaw.com
PINEDOLAW
1700 N. Broadway, Suite 430
Walnut Creek, CA  94596
Telephone:      415-693-9155
Facsimile:      415-524-7564

Attorneys for Plaintiff
RECOLOGY INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RECOLOGY INC., | Case No. 20-cv-01150-PJH |
| Plaintiff, | **RECOLOGY INC.'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| BERKLEY REGIONAL INSURANCE COMPANY; and DOES 1-20, inclusive, | Date:   November 3, 2022 |
| Defendants. | Time:  1:30 p.m. |
| | Department:  Courtroom 3, 3rd Floor |
| | Before the Hon. Phyllis J. Hamilton |
| | Complaint Filed:  October 4, 2019 |
| | Trial Date:      May 1, 2023 |

1

## <u>TABLE OF CONTENTS</u>

2  TABLE OF AUTHORITIES……………………………………………………………………………..ii

3  NOTICE OF MOTION ........................................................................................ 1

4  MEMORANDUM OF POINTS AND AUTHORITIES ....................................... 1

5       A.      STATEMENT OF ISSUES TO BE DECIDED ................................ 1

6       B.      INTRODUCTION AND SUMMARY OF ARGUMENT ................... 2

7       C.      BRIEF STATEMENT OF UNDISPUTED FACTS ............................ 3

8            1.      The Parties………………………………………………………………………3

9            2.      The "Employee Theft" Policy ……………………………………………3

10           3.      The Fraudulent Schemes…………………………………………………5

11                a.      The Hay Road Landfill or "HRL"…………………………………5

12                b.      Normal Operations at the HRL……………………………………6

13                c.      Scheme 1:  The Lucero Scheme……………………………………7

14                d.      Scheme 2:  The Weighmaster Scheme……………………………9

15           4.      Recology's Notice and Sworn Proofs of Loss……………………11

16           5.      BRIC's Investigation and Coverage Position……………………12

17      D.      ARGUMENT………………………………………………………………………14

18           1.      Insurance Policy Interpretation Under California Law…………………14

19           2.      Scope of the Coverage Provision…………………………………………15

20                a.      Recology's Former Employees Committed "Theft"……………...16

21                b.      Case Law Strongly Supports Coverage…………………………17

22                c.      "Theft" Is "Any Dishonest Act"…………………………………20

23                d.      At Best for BRIC, "Taking" Is Ambiguous……………………22

24           3.      Recology Lost "Money" And "Property" As A Result of "Theft"………23

25                a.      Recology Lost "Money" As A Result of "Theft"………………...23

26                b.      Recology Lost "Property" As A Result of "Theft"………………25

27      E.      CONCLUSION ..................................................................... ……25

28

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

C<span style="font-variant:small-caps">ASES</span>

4

*Bias v. Moynihan*,
  508 F.3d 1212 (9th Cir. 2007)............................................................................. 11

5

*Cargill, Inc. v. National Union Fire Ins. Co. of Pittsburgh*,
  Civ. No. A03-187, 2004 WL 51671 (Minn. Ct. App. Jan. 13, 2004) .................................... 19

6

*Guyan Internation, Inc. v. Professional Benefits Administrators, Inc.*,
  No. 5:10 CV 823, 2013 WL 1338194 (N.D. Ohio Mar. 28, 2013)........................................ 20

7

8

*Haynes v. Farmers Ins. Exch.*,
  32 Cal.4th 1198 (2004) ............................................................................. 15

9

*Kazi v. State Farm Fire & Casualty Co.*,
  24 Cal.4th 871 (2001) ............................................................................... 9

10

11

*MacKinnon v. Truck Ins. Exch.*,
  31 Cal.4th 635 (2003) ............................................................................... 14

12

*People v. Morse*,
  2017 WL 5414832, No. H043571 (Cal. Ct. App. Nov. 14, 2017)............................... 8, 18, 23

13

14

*Maryland Casualty Co. v. Reeder*,
  221 Cal.App.3d 961 (1990)........................................................................... 24

15

*Morris Kirschman & Co., LLC v. Hartford Fire Ins. Co.*,
  No. Civ. A. 03-1743, 2004 WL 1934848 (E.D. La. Aug. 30, 2004) .................................... 20

16

17

*National Union Fire Ins. Co. v. Resources Devel. SVC*,
  10-cv-01324-JF/PVT (N.D. Cal. Nov. 16, 2010)........................................................ 9

18

*National Union Fire Ins. Co. v. Cargill, Inc.*,
  20-cv-0839 (WMW/JFD), 2021 WL 3733028 (D. Minn. Aug. 24, 2021) ........................... 18

19

20

*People v. Pak*,
  3 Cal.App.5th 1111 (2016) .......................................................................... 17

21

*Pine Belt Automotive, Inc. v. Royal Indem. Co.*,
  No. 06-5995 (JAP), 2008 WL 4682582 (D.N.J. Oct. 21, 2008) .......................................... 22

22

23

*Prudential –LMI Comm. Ins. Co. v. Reliance Ins. Co.*,
  22 Cal.App.4th 1508 (1994) ......................................................................... 24

24

*Richardson v. Kinsale Ins. Co.*,
  No. 18-cv-02962-DMR, 2019 WL 2300376 (N.D. Cal. May 30, 2019) ....................... 15, 22

25

26

*Sherwin-Williams Co. v. Beazley Ins. Co.*,
  No. 18-cv-02964 (DWF/DTS), 2020 WL 4226866 (D. Minn. July 23, 2020) ................ 19, 20

27

28

1

*Taylor Chrysler Dodge, Inc. v. Universal Underwriters Ins. Co.*,
   No. 08C4522, 2009 WL 3187234 (N.D. Ill. Sept. 30, 2009) .................................................. 9

2

*Tesoro Refining & Marketing Co. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
   96 F.Supp.3d 638 (W.D. Tex. 2015) .................................................................................. 22

3

4

*Thee Sombrero, Inc. v. Scottsdale Ins. Co.*,
   28 Cal.App.5th 729 (2018) ............................................................................................... 25

5

*Waller v. Truck Ins. Exchange, Inc.*,
   11 Cal.4th 1, 23 (1995) .................................................................................................... 15

6

7

*Whitney Equip. Co. v. Travelers Cas. & Sur. Co. of Am.*,
   431 F.Supp.3d 1223 (W.D. Wash. 2020) .......................................................................... 19

8

*Williams Electronics Games, Inc. v. Barry*,
   No. 97C3743, 2000 WL 106672 (N.D. Ill. Jan. 13, 2000) ............................................. 14, 15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 3, 2022, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, Oakland Courthouse, Courtroom 3, 3rd Floor, 1301 Clay Street, Oakland, California, 94612, plaintiff Recology Inc. (Recology) will move for orders pursuant to Fed. R. Civ. P. 56 granting summary judgment or partial summary judgment of (1) the duties of defendant Berkley Regional Insurance Company (BRIC) under a Commercial Crime insurance policy it issued to Recology with a policy period from October 1, 2014, to October 1, 2015, and $5 million in "per occurrence" limits, and (2) BRIC's Fourth Affirmative Defense (based on Exclusion D.1.c).

These motions are based on this notice, the accompanying declarations, the memorandum of points and authorities, the papers and pleadings on file in this action, and such other further papers a may be submitted prior to or at the hearing of this motion, if any.

Recology seeks the following summary judgment rulings with respect to BRIC's duties under the Policy, or such other rulings that the Court deems appropriate, including partial summary judgment of any issues raised herein.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**A.     Statement of Issues to Be Decided.**  Recology requests the Court grant summary judgment or partial summary judgment in its favor and against BRIC on each or all of the following issues:

a.      With respect to the Lucero Scheme, the Policy provides coverage to Recology for losses in excess of the $25,000 "per occurrence" deductible, up to the $5 million "per occurrence" policy limit, resulting directly from employees allowing customers to dump waste without payment, or with payment reflecting a misclassified reduced rate, in exchange for kickbacks.

b.      Recology is entitled to an award of $1,769,288.22 on its Lucero Scheme breach of contract claim.

c.      With respect to the Weighmaster Scheme, the Policy provides coverage for losses in excess of the $25,000 "per occurrence" deductible, up to the $5 million "per occurrence" policy limit, resulting directly from employees allowing customers to dump waste without payment, in exchange for kickbacks.

d.      Recology is entitled to an award of $784,106.73 on its Weighmaster Scheme breach of contract claim.

e.      Recology is entitled to partial summary judgment of BRIC's Fourth Affirmative Defense (Dkt. 31), which asserts that Recology's claims are barred by Exclusion D.1.c. "to the extent it applies," because Exclusion D.1.c. does not apply.

**B.      Introduction And Summary of Argument**

BRIC sold Recology a "Commercial Crime Policy" (the "Policy") with a policy period of October 1, 2014, to October 1, 2015, and providing a $5 million "per occurrence" limit for loss or damage to money or property resulting directly from employee "theft." The Policy defines "theft" as an "unlawful taking of property to the deprivation of [Recology]."

In 2015, while the Policy was in effect, Recology discovered that its (now former) employees at its Hay Road landfill (HRL) in Vacaville, California, permitted customers to dump waste for no or reduced payment in exchange for kickbacks. Recology promptly and timely notified BRIC after the discovery and requested coverage for losses incurred as a result of the fraudulent schemes. Recology also retained outside legal counsel at Morrison & Foerster LLP and an independent forensic accountant at Wilson Consulting with expertise in the waste management industry and landfill fraud investigations to investigate the schemes and determine the amount of its loss. The investigation alone cost Recology more than a million dollars.

In 2016, Recology submitted two proofs of loss—one for each scheme—supported by hundreds of pages of evidence and establishing losses well in excess of the policy limits due in large part to the broad scope of the schemes, which the lead investigator for the Solano County District Attorney's office estimated began more than ten years before they were discovered.

In 2018, after years of investigating Recology's claims, as a gesture of "good faith," BRIC finally made two small payments in the amounts of: (1) $133,450 (for a portion of the kickbacks

Recology could prove to BRIC's satisfaction that its employees received), and (2) $25,000 in "investigative costs" in connection with one of the two schemes, for a total of $158,450. BRIC denied coverage and refused to pay anything for the largest component of Recology's loss, *i.e.*, the uncollected landfill fees lost as a result of its employees permitting customers to dump their waste at the HRL for a reduced or no payment.

The question of whether the Policy covers Recology's loss is tailor-made for resolution on summary judgment. The undisputed material facts are that Recology suffered a covered loss in the amount of at least $2,553,394.95 across all schemes as a direct result of employee "theft" of money or property to the deprivation of Recology. Although the Policy does not require criminal wrongdoing for a "theft" to occur, an average layperson would reasonably conclude that losses resulting directly from felony "grand theft" of uncollected landfill fees for which Recology's former employees were indicted by a grand jury—and found guilty—would be covered as "employee theft" under the plain language of their crime policy. A consensus of district courts interpreting nearly identical policy language have found coverage on less compelling facts and rejected BRIC's reason for denying coverage. Accounting for the two $25,000 "per occurrence" deductibles and $40,000 in (unpaid) restitution awarded to Recology as partial compensation for its loss, Recology is entitled to judgment as a matter of law awarding it $2,488,394.5 in damages.

## C. Brief Statement of Undisputed Facts

### 1. The Parties

Recology is a 100% employee-owned San Francisco-based resource recovery company that collects, sorts, and processes waste materials. Lyons Decl. ¶ 2.

BRIC is an Iowa-based insurance company. BRIC is a member of the W.R. Berkley family of insurance companies, comprised of more than 50 insurers worldwide and with a market capitalization of more than $16.8 billion. Pinedo Decl. Ex. A & ¶ 2.

### 2. The "Employee Theft" Policy

In 2009, Recology purchased its first Commercial Crime policy from BRIC, entitled "Commercial Crime Policy (Discovery Form)" and renewed the Commercial Crime policy every year. Lyons Decl. ¶ 3. The most recent renewal covers the policy period from October 1, 2015,

1    to October 1, 2016.  *Id.*  Over the course of this longstanding relationship, Recology paid

2    hundreds of thousands of dollars in premium to BRIC.  *Id.*

3        Recology purchased Commercial Crime policy no. BCR-70000130-14, with a policy

4    period from October 1, 2014, to October 1, 2015 (the "Policy").  Lyons Decl. Ex. A.  Recology is

5    the named insured under the Policy.  *Id.* [Declarations page].  The Policy provides $5 million in

6    limits "per occurrence" and contains a $25,000 deductible "per occurrence."  *Id.*  The Policy is

7    based on the ISO Standard Form CR 00 22 (version 05 06).  *Id.*

8        Insuring Agreement A.1. of the Policy, entitled "Employee Theft," provides:

9    **A.    Insuring Agreements**

10       Coverage is provided under the following Insuring Agreements for
     which a Limit of Insurance is shown in the Declarations and applies
11       to loss that you sustain resulting directly from an "occurrence"
     taking place at any time which is "discovered" by you during the
12       Policy Period shown in the Declarations or during the period of
     time provided in the Extended Period To Discover Loss Condition
13       **E.1.j.**:

14       **1.    Employee Theft**

15       We will pay for loss of or damage to "money," "securities" and
     "other property" resulting directly from "theft" committed by an
16       "employee," whether identified or not, acting alone or in collusion
     with other persons.
17

18       For the purposes of this Insuring Agreement, "theft" shall also
     include forgery.
19

20       The Policy defines "theft" as "the unlawful taking of property to the deprivation of

21   [Recology]."  Policy, § F.20.

22   **E.    Conditions**

23       …

24       **1.    Conditions Applicable To All Insuring Agreements**

25       …

26           **p.    Ownership Of Property; Interests Covered**

27               The property covered under this policy is limited to
             property:

28               (1)    That you own or lease; or

            (2)      That you hold for others whether or not you are legally liable for the loss of such property.

…

**F.**    **Definitions**

…

     **15.**    "Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include computer programs, electronic data or any property specifically excluded under this policy.

Policy, § F.15.

      **3.**    **The Fraudulent Schemes**

      **a.**    **The Hay Road Landfill or "HRL"**

Recology owns the Hay Road landfill ("HRL") located in Vacaville, California, approximately 12 miles south of Dixon in Solano County. Lyons Decl. ¶ 2. Recology uses the HRL to service certain of its collection operations in the Bay Area. *Id.* Recology incurred millions of dollars in capital costs to purchase the HRL and obtain and renew the necessary licenses and permits to operate the HRL as a landfill. *Id.* ¶ 5. As a condition of its purchase of the HRL, Recology also assumed substantial closure and post-closure maintenance costs and contingent liabilities for any harm to the environment as a result of its operations at the HRL or its closure and post-closure activities. *Id.*

For as long as BRIC has issued Commercial Crime policies to Recology dating back to 2009, Recology has used the HRL to service its waste collection operations as well as offer a disposal facility for other waste haulers and self-haulers in the region. Lyons Decl. ¶ 6. The HRL site is permitted as a Class II landfill. *Id.* As the owner and operator of the HRL, the commodity Recology sells is landfill space (measured in cubic yards) at a facility zoned and permitted to accept and dispose of waste debris. Declaration of Ross Wilson ("Wilson Decl."), ¶ 9. The price Recology charges its customers to dump waste varies depending on the waste density of the debris (measured in pounds per cubic yard), among other factors. *Id.* Generally, the higher the waste density, the lower the price, because higher density debris such as concrete

1   consumes less space per pound of debris.  *Id.*  Recology charges more for lower density "general

2   debris" because it consumes more permitted landfill space per ton.  *Id.*

3        Unused permitted landfill space at the HRL is finite and valuable.  Wilson Decl. ¶ 10.  At

4   some point all the space will be consumed and the HRL can no longer accept waste material and

5   must begin the process of permanently closing.  *Id.*

6                **b.**        **Normal Operations at the HRL**

7        To dispose of waste at the HRL, a truck enters the inbound scale and is weighed, the

8   commodity is noted, and other data about the waste is collected (*e.g.*, where the waste was

9   generated and the customer account).  Wilson Decl. ¶ 11.  The weight of the load is determined

10  by comparing the loaded truck's weight against its weight when empty (its "tare" weight).  *Id.*  At

11  this point in the process, there are two methods for completing a weight ticket:

12      (1)  Method one:  tare weight tickets.  Trucks that have their "tare" weight stored on

13  Recology's system receive a weight ticket and either pay the disposal fee at this point or the ticket

14  amount is put on their account for subsequent payment.  Wilson Decl. ¶ 12.  These trucks then

15  drive to the working face of the landfill, dump their load, which consumes the permitted landfill

16  space, then exit the landfill without a need to stop at the scale house.  *Id.*

17      (2)  Method two:  no tare weight tickets.  Trucks without a tare weight will have a weight

18  ticket "staged," *i.e.,* all pertinent information except the empty "tare" weight is recorded.  Wilson

19  Decl. ¶ 13.  The trucks then proceed to the working face of the landfill, dump their load, which

20  consumes the permitted landfill space, then return to the scale house for measuring and recording

21  of the tare weight and generation of the weight ticket.  The customer may either pay the disposal

22  fee at this point or the ticket amount is put on their account for subsequent payment.  Finally, the

23  customer exits the landfill.  *Id.*  Regardless of which method is used, the weight ticket shows the

24  identity of the customer, the origin of the load, the date and time, the scale(s) used, the weight and

25  type of waste being disposed of, and the total charge.  *Id.* ¶ 14.

26               **c.**        **Scheme 1:  The Lucero Scheme**

27       The first claim relates to loss resulting from a scheme involving its former employee,

28  Toby Soares.  Mr. Soares worked for Recology for 28 years until his employment was terminated

1   on or about June 9, 2016.  Lyons Decl. ¶ 7.  In 2002, and throughout the remainder of his

2   employment, Mr. Soares' job title was Landfill Foreperson.  In this capacity, Mr. Soares' duties

3   included operating heavy equipment, instructing workers on daily and weekly work details,

4   maintaining customer relations and interactions, and any other assigned duties.  *Id.*

5          In September 2015, Recology met with representatives of the Alameda County Waste

6   Management Authority (ACWMA) and the Alameda Sheriff's Office and learned of an

7   investigation by ACWMA into fraudulent acts and practices committed by one or more Recology

8   employees involving several "weight ticket" discrepancies at the HRL.  Lyons Decl. ¶ 8.

9   Recology was informed that ACWMA was in possession of weight tickets of HRL customers that

10  disposed of waste originating in Alameda County.  *Id.*  The weight tickets showed one type of

11  waste being disposed of at the HRL (general debris), while Recology's records submitted to

12  Alameda County showed that those very same tickets were generated from the disposal of a

13  different type of waste ("CNASP," *i.e.*, concrete and asphalt) at the HRL, resulting in Alameda

14  County receiving lower fees than required.  *Id.*  The fees due and payable to Alameda County

15  were higher for general debris than for CNASP.  *Id.*

16         At the meeting, the ACWMA and Sheriff's Office representatives instructed Recology not

17  to change any of its practices or procedures or take any other action that could prematurely alert

18  the individuals engaged in the wrongdoing about their investigation.  Lyons Decl. ¶ 9.  Recology

19  was also directed not to take any action to prevent additional losses without coordination with

20  ACWMA and was asked to keep the circle of individuals "in the know" about the investigation as

21  small as possible for the same reasons.  *Id.*  The Solano County District Attorney was

22  subsequently brought into the investigation, as the HRL is located in Solano County, California.

23  *Id.*  The District Attorney's office also cautioned Recology against changing any of its practices

24  or procedures, or taking actions that could tip off any of the individuals engaged in the scheme,

25  including actions to prevent additional losses.  *Id.*

26         After the ACWMA meeting, Recology established a special committee of the Board of

27  Directors to monitor and supervise its internal investigation.  Lyons Decl. ¶ 10.  The special

28  committee retained outside counsel at Morrison & Foerster LLP to investigate the matter.  *Id.*

Outside counsel engaged the services of Wilson Consulting to assist with the forensic accounting aspects of the investigation.  *Id.*  Mr. Wilson was recommended by ACWMA representative Brian Mathews, who worked with Mr. Wilson on prior landfill fraud investigations, including an investigation of fraud at the Kirby Canyon landfill in Santa Clara County involving nearly identical misconduct by landfill employees and a waste broker named James P. Lucero with a history of defrauding landfill owners.[1]  Wilson Decl. ¶ 8.

During a series of interviews with the Solano County District Attorney's office in 2016, Mr. Soares confessed to colluding with Mr. Lucero to engage in a series of "mischaracterizations" and "bypasses" of waste at the HRL in return for hundreds of thousands of dollars in cash kickbacks (the "Lucero Scheme").  Wilson Decl. ¶ 15 & Ex. B.  The mischaracterizations involved Lucero-related trucks entering the inbound scale and receiving an inaccurate weight ticket.  *Id.*  Specifically, instead of inputting the correct waste type (*e.g.*, lower density, higher priced general debris) on the ticket, the debris was mischaracterized as cheaper "CNASP," *i.e.*, concrete.  *Id.*  The trucks would then leave the scale and dump the waste in the general debris section of the landfill, not in the concrete section.  *Id.*

Pursuant to the Lucero *misclassification* scheme, Mr. Lucero deposited $50 per load into Mr. Soares' bank account for each customer that was charged the ***lower amount*** for disposal of CNASP than the actual price for the type of debris dumped at the HRL.  Wilson Decl. ¶ 16.  Mr. Lucero pocketed the difference between (a) the rate his customers paid him, plus the amount paid for the CNASP, and (b) the $50 he paid to Mr. Soares for each mischaracterized load.  *Id.*

The Lucero *bypass* scheme involved no weight tickets.  Wilson Decl. ¶ 17.  Under this scheme, no weight tickets were given when trucks entered the inbound scale.  *Id.*  After leaving the scale, the trucks pulled up to the appropriate section of the landfill, dumped the waste load,

_____

[1] Mr. Lucero and employees at the Kirby Canyon Landfill were indicted and convicted of felony conspiracy to commit grand theft (Pen. Code, §§ 182(a)(1), 484-487(b)(3)) and commercial bribery (Pen. Code, § 641.3) for making and accepting bribes in exchange for allowing customers to dump waste at the landfill without payment, or with payment reflecting a misclassified reduced rate.  *See People v. Morse*, No. H043571, 2017 WL 5414832 (Cal. Ct. App. Nov. 14, 2017) (describing virtually identical bypass and misclassification schemes to induce Waste Management employees to defraud their employer).

1  and exited the HRL, resulting in no record of the transaction and **no payment** to Recology.  *Id.*

2  Mr. Lucero deposited cash in the amount of $100 per load to Mr. Soares' bank account for each

3  customer he allowed to dispose of waste at the HRL without payment to Recology.  *Id.*  Mr.

4  Lucero pocketed the difference between the rate his customers paid him for proper waste

5  disposal, and the $100 he paid to Mr. Soares.  *Id.*[2]

6            **d.**        **Scheme 2:  The Weighmaster Scheme**

7        Recology discovered a second significant loss at the HRL as a direct result of conduct by

8  certain other HRL scale house employees (now former employees):  Terri Wilson, Marion Allen,

9  and Frances Jackson.  Recology hired these individuals as "weighmasters" at the HRL on

10  September 25, 2006; October 31, 2005; and June 29, 2015, respectively.  Lyons Decl. ¶ 11.  In

11  August 2015, an HRL customer who had been going to the HRL for 12 years and wished to

12  remain anonymous informed Recology that he personally observed scale house employees

13  allowing trucks to bypass the scale without officially weighing in the trucks and issuing them the

14  required weight ticket.  *Id.*  He also informed Recology the employees were taking cash from

15  other customers and wanted him to pay in cash.  *Id.*

16        Preliminary surveillance by Recology showed that trucks were, in fact, bypassing the

17  scale without the former employees issuing weight tickets to the truck drivers.  Lyons Decl. ¶ 12.

18  The special committee of the Board of Directors retained Morrison & Foerster to investigate the

19  matter, after which law enforcement was brought into the investigation.  *Id.*  Wilson Consulting

20  was engaged to assist with the forensic accounting aspects of the investigation.  *Id.*  As

21  mentioned, Recology was instructed by law enforcement not to take any action that could

22  jeopardize its investigation or to inform the scale house employees.  *Id.*  The investigation

23  revealed that former HRL scale house employees allowed certain HRL customers to bypass the

24  scales and dispose of general debris at HRL without payment to Recology, in exchange for cash

25  kickbacks (the "Weighmaster Scheme").  *Id.*

26

27       [2] Recology understands that Mr. Soares was not charged with a crime due to the expiration of the applicable statute of limitations.

28

On March 18, 2016, law enforcement executed search warrants at Ms. Allen's and Ms. Wilson's homes and discovered approximately $250,000 in cash, mostly in stacks of hundred dollar bills hidden throughout the house.  Rowe Decl. ¶ 11.  Law enforcement also observed expensive home improvements, expensive electronics, a trailer, recreational vehicle (RV), and a one-year-old Cadillac SRX on Ms. Wilson's property.  *Id.*  Both women were also frequently observed gambling tens of thousands of dollars at a nearby casino, and incurred substantial losses, making it highly unlikely the cash seized from their homes are from casino winnings.  *Id.*  When asked where all the cash came from, Ms. Allen's husband explained that the money came from Ms. Allen "letting the trucks go by" at the landfill.  *Id.* ¶ 13.

That same day, the District Attorney's office interviewed (or attempted to interview) Ms. Allen, Ms. Wilson, and Ms. Jackson.  Ms. Allen and Ms. Wilson invoked their right under the Fifth Amendment of the U.S. Constitution not to self-incriminate.  Rowe Decl. ¶¶ 8-9, Wilson Decl. ¶ 19.  Ms. Jackson confessed during her interview.  Rowe Decl. ¶ 10.  She substantiated that scale house employees, specifically she, Ms. Allen, and Ms. Wilson, allowed trucks to pass without issuing weight tickets or collecting payment for Recology in return for a cash kickback.  *Id.*  Ms. Jackson stated that she knew of the bypass scheme from the start of her employment at HRL in June 2015.  *Id.*  Ms. Jackson said she was pressured to keep quiet about the bypass scheme and told that, "what happens in the scale house stays in the scale house."  *Id.*  Ms. Jackson also assisted Recology in identifying various bypass loads of general debris disposed of at HRL and certain of the customers associated with the loads.  *Id.*  All three women were immediately put on leave by Recology and subsequently terminated.  Lyons Decl. ¶ 12.

On June 21, 2018, based in part on the testimony and analysis of Recology's forensic accountant, Ms. Allen and Ms. Wilson were indicted by a grand jury on 38 counts of felony grand theft in violation of Section 487(a) of the California Penal Code, in that "said defendant did unlawfully take money and personal property of a value exceeding…$950, to wit Money/Cash the property of Recology."  Wilson Decl. ¶ 21 & Ex. D.  To satisfy the $950 threshold for "grand theft" of "money…or real or personal property taken," Pen. Code, § 487(a), the uncollected

1  landfill fees—in some cases, in excess of $1,500 per load—under the Weighmaster bypass

2  scheme were used.  *Id.*

3  The Indictment also included 1 count of conspiracy to commit grand theft.[3]  In support of

4  the conspiracy count, the Indictment alleged three overt acts in furtherance of the conspiracy: (1)

5  "[a]llow[ing] trucks entering Hay Road Landfill to bypass weight system that determines landfill

6  fees," (2) "[f]ail[ing] to generate or issue weight ticket, invoice or any record of sale to incoming

7  trucks as required by Recology's standard operating procedures," and (3) "[a]ccept[ing]

8  unauthorized payments in exchange for access to Hay Road Landfill."  Wilson Decl. Ex. D.

9  On January 27, 2022, at a trial setting conference, both women pled *nolo contendere* (no

10  contest) to multiple counts of felony grand theft, were placed on probation, and were ordered to

11  pay $20,000 each in restitution to Recology ($40,000 total).  Pinedo Decl. ¶ 3 & Ex. B.

12  **4.  Recology's Notice of Claims and Sworn Proofs of Loss**

13  On September 30, 2015, Recology gave notice of two claims under the Policy :  (1) the

14  "Lucero Claim" (Claim No. 1897) and (2) "Weighmaster Claim" (Claim No. 1898).  Lyons Decl.

15  ¶ 14 & Ex. B.  BRIC acknowledged receipt of the claims on October 1, 2015.  *Id.* Ex. C.

16  In 2016, Recology provided BRIC with sworn proof of its losses incurred as a result of the

17  Lucero Scheme and the Weighmaster Scheme (hereinafter, the "Lucero Proof of Loss" and

18  "Weighmaster Partial Proof of Loss," respectively).  Lyons Decl. ¶ 15, Exs. D & E.  Each Proof

19  of Loss provided a detailed "Description of Loss" and contained supporting evidence in

20  appendices spanning several hundred pages.  *Id.*[4]

21  The Lucero Proof of Loss, as amended, established losses to Recology in the amount of

22  $1,769,288.22.  Lyons Decl. ¶ 15, Exs. D & F.  The Weighmaster Partial Proof of Loss

23

24  [3] Courts routinely take judicial notice of other court proceedings.  *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007)("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'").  Recology requests judicial notice of documents in the underlying criminal proceedings involving Ms. Wilson and Ms. Allen.  *See* Pinedo Decl. Ex. B.

25

26  [4] The voluminous appendices were submitted to BRIC with the Proofs of Loss in electronic and hard copy and provided to BRIC again in discovery.  Upon request, the appendices will be made available to BRIC a third time or produced in Court.  *See* Fed. R. Evid. 1006.

27

28

1   established losses to Recology in the amount of $784,106.73 for the nine-month period from June

2   29, 2015, through March 17, 2016, based on then-available data.[5]  *Id.* ¶ 16 & Ex. E.  Recology

3   reserved its right to supplement the Weighmaster Partial Proof of Loss with further losses as

4   additional information came to light.  *Id*.

5                    **5.      BRIC's Investigation and Coverage Position**

6          Upon discovering its employee theft losses, Recology promptly notified BRIC and

7   requested coverage.  Lyons Decl. ¶ 14 & Ex. B.  For the next three years, Recology provided

8   BRIC's counsel with additional documentation and information regarding the schemes and

9   Recology's loss and met with BRIC multiple times, at the HRL and elsewhere, to further explain

10   its operations and the basis for its loss calculations.  For instance, in October 2016, BRIC's

11   outside counsel Michael Keeley requested additional information it claimed to need to "allow

12   BRIC to more fully evaluate Recology's claim," including answers to 23 multi-part questions and

13   6 categories of documents, which Recology provided.  Liu Decl. Exs. A & B.

14          Over the next year, BRIC's outside counsel interviewed current and former employees of

15   Recology and made several additional requests for information from Recology.  BRIC's counsel

16   also interviewed Recology's forensic accountant, Mr. Wilson, and received a copy of Mr.

17   Wilson's interview notes with the confidential informant.  Wilson Decl. Ex. B.[6]

18          On November 17, 2017, two years after Recology gave notice of its claims, BRIC

19   provided Recology with its "preliminary" coverage analysis.  Liu Decl. Ex. C.  On December 22,

20   2017, BRIC sent another letter purporting to "reiterate and further explain [its] coverage position

21   in connection with the above two matters [*i.e.*, the Lucero Claim and Weighmasters Claim]."  *Id.*

22          [5] According to witnesses, the Weighmaster Scheme likely began long before 2015, and

23   possibly as early as 2003, supporting a loss far in excess of the $5 million limit.  *See* Rowe Decl.
     ¶ 15 & Ex. A; Lyons Decl. Ex. E at p. 10.  Recology, however, only seeks summary judgment of

24   $784,106.73 in connection with the Weighmaster Scheme at this time.

25          [6] After the completion of the criminal proceedings, the District Attorney's Office
     produced thousands of pages of documents from its investigation file to BRIC, including a

26   transcript of the grand jury testimony, grand jury exhibits, and hundreds of pages of deposition
     and interview transcripts Recology produced to the District Attorney's Office pursuant to a

27   subpoena in the criminal proceedings.  All tolled, the District Attorney's production to BRIC
     consisted of more than 3 TB of data.  Pinedo Decl. ¶ 5.

28

1    Ex. D.  In the December 22 letter, BRIC's counsel wrote, "the only loss covered by the Policy is

2    the amount of kickbacks received by Recology's former employees."  *Id.*

3         In March 2018, representatives of BRIC and Recology met in New York to further discuss

4    Recology's claims.  Wilson Decl. ¶ 20.  At this meeting, Recology's forensic accountant Mr.

5    Wilson explained in detail the methodology for determining the loss to Recology as a result of the

6    schemes.  BRIC's senior claims officer Megan Manogue also attended the meeting.  Ms.

7    Manogue did not dispute the amount of the loss or disagree with the method Mr. Wilson used to

8    determine the amount of the loss.  She told Recology's representatives that BRIC had paid larger

9    claims with far less evidence than the evidence supporting Recology's claims.  *Id.*

10        On May 12, 2018, more than two months later, Ms. Manogue entered the following note

11   in BRIC's claims file corroborating what she told Recology at the March meeting:

12
13         [Plaintiff] reviewed both losses, had picture of cite [sic], and explained how calculated
           the lost revenue.  ***I indicated that while I appreciate the information, our difference***
14         ***lies not in determining the amount of lost revenue but in the fact that BRIC doesn't***
           ***believe any of the lost revenue is covered***.  ***Only the kickbacks.  I advised I would***
15         ***give consideration to discussion but was not sure we could close that gap.***  Sent
           subsequent email advising my position re lost revenue remains unchanged…
16

17   Pinedo Decl. Ex. C (Emphasis added).

18        Recology heard nothing further from BRIC's counsel until it received a letter dated June

19   22, 2018, seven months after its previous letter.  In that letter, BRIC's counsel provide two checks

20   in the amounts of $133,450 and $25,000, representing a portion of the kickbacks received by Mr.

21   Soares from Mr. Lucero, less the deductible, and the $25,000 limit for investigative expenses for

22   the Lucero Scheme.  BRIC's counsel also confirmed BRIC's willingness to reimburse Recology

23   only for the kickbacks its employees received "in connection with the two schemes, minus the

24   two [per occurrence] deductibles of the Policy."  Liu Decl. Ex. E.

25        In April 2019, BRIC's outside counsel sent an email to Recology that confirmed, "we

26   have spoken with everyone we believe would be productive to speak with."  Liu Decl. Ex. F.

27   BRIC did not reverse or reconsider its denial of coverage for "anything other than kickbacks" in

28   this communication or in any subsequent communication.

1    Plaintiff filed this lawsuit on October 4, 2019, asserting claims for breach of contract and

2    bad faith, and seeking a declaration regarding the parties' rights and obligations under the Policy.

3    **D.    ARGUMENT**

4       **1.    Insurance Policy Interpretation Under California Law**

5    There is no dispute that California law applies in this diversity case.  Interpretation of an

6    insurance policy and determination of the rights and obligations thereunder are questions of law

7    for the court.  *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 655 (2003).  "The rules governing

8    policy interpretation require us to look first to the language of the contract in order to ascertain its

9    plain meaning or the meaning a layperson would ordinarily attach to it."  *Waller v. Truck Ins.*

10   *Exch., Inc.*, 11 Cal.4th 1, 18 (1995).  The Policy must be read from the perspective of an ordinary

11   person and not a lawyer or insurance expert.  *Haynes v. Farmers Ins. Exchange*, 32 Cal.4th 1198,

12   1211 (2004) (insurance policy must be read from the perspective of an "average lay reader," not

13   according to what "an attorney or an insurance professional likely could deduce from close

14   examination" of the document).

15   Under California law, coverage grants are "interpreted broadly so as to afford the greatest

16   possible protection to the insured."  *MacKinnon*, 31 Cal.4th at 655.  Unlike coverage grants,

17   "exclusionary clauses are interpreted narrowly against the insurer."  *Id.* (internal quotations and

18   citation omitted).  "An insurer cannot escape its basic duty to insure by means of an exclusionary

19   clause that is unclear."  *Id*. (quotation omitted).  California courts, moreover, "broadly construe[ ]

20   exceptions to exclusions in favor of the insured."  *Richardson v. Kinsale Ins. Co.*, No. 18-cv-

21   02962-DMR, 2019 WL 2300376, at *5 (N.D. Cal. May 30, 2019) (applying California law).

22   Limitations on coverage, including exclusions, are not enforceable unless the insurer has

23   expressed those limitations in language that is "conspicuous, plain and clear," as well as

24   "unambiguous."  *MacKinnon*, 31 Cal.4th at 655.  "This rule applies with particular force when the

25   coverage portion of the insurance policy would lead an insured to reasonably expect coverage for

26   the claim purportedly excluded."  *Id*. (citation omitted).

27

28

1    "To the extent any language in the policy is ambiguous, the court will construe that

2    language in favor of the insured." *Richardson*, 2019 WL 2300376, at *5. "The burden is on…the

3    insurer to establish that the claim is specifically excluded." *MacKinnon*, 31 Cal.4th at 655.

4                    **2.      Scope of the Coverage Provision**

5            The first step in the analysis is to determine whether Recology's loss of money or property

6    as a result of "grand theft by its employees falls within the scope of the "Employee Theft"

7    insuring agreement. *See* Policy, § A.1.  Notably, BRIC does not dispute that the kickbacks

8    Recology's employees received are a covered loss under the "Employee Theft" provision, that

9    those involved in the schemes were Recology employees, or that Recology was "cheated out of

10   revenues it should have received" as a result of its former employees permitting customers to

11   dump waste for no or reduced payment. *See, e.g.,* Liu Decl. Ex. D at 1.[7]

12           Nor is there any dispute that the employees involved in the schemes permitted trucks to

13   dump waste for no or reduced payment.  Mr. Soares confessed during an interview with

14   Recology's forensic accountant and law enforcement, and Ms. Wilson and Ms. Allen were

15   indicted by a grand jury and found guilty of felony grand theft for doing precisely that.

16           Nor is there even a genuine dispute between the parties as to the ***amount*** of the loss to

17   Recology as a result of its employees' misconduct.  As mentioned, BRIC's Chief Claims Officer,

18   Megan Manogue, informed Recology that BRIC had no issue with the amount of the loss or the

19   method used to determine it, which she corroborated in an email and note to the claims file.

20           The disputed issues, therefore, are straightforward:  (1) whether Recology's former

21   employees committed "theft" within the meaning of the Policy, and (2) whether Recology lost

22   _____

23           [7] Beyond BRIC, the special grand jury in the criminal proceedings involving these very
     employees (*People v. Allen* and *People v. Wilson*), Case Nos. FCR338492 and FCR338494, and
24   the trial court and court of appeal in *People v. Morse*, involving the same types of schemes and
     the same waste broker (Lucero), all had no difficulty recognizing the substantial loss to the
25   landfill owner-victim generally, and to Recology in particular, as a result of "theft" of the
     uncollected dumping fees.  This includes Waste Management's insurer, National Union, who
26   brought an insurance subrogation action to recover the $13 million it paid to Waste Management
     as a result of the same fraudulent schemes at issue here that BRIC refuses to cover on the
27   specious argument that conduct everyone including the defendants agree is "grand theft" is not
     "theft."  *See* Pinedo Decl. Ex. D (subrogation lawsuit alleging $13 million loss as a result of
28   bypass and misclassification schemes involving former Waste Management employees).

1    money or property as a direct result of theft.  The undisputed material facts establish that

2    Recology suffered a covered loss of "money" **and** "property" due to employee "theft."

3    **a.    Recology's Former Employees Committed "Theft"**

4    The Court can and should determine that a "theft" occurred based on the plain language of

5    the Policy.  The Policy defines "theft" as the "unlawful taking of property to the deprivation of

6    the insured."  *See* Policy, § F.20.  The average person purchasing commercial ***crime*** insurance

7    would reasonably interpret coverage for "theft" to include felony "grand ***theft***," which is precisely

8    the crime for which Recology's former employees were indicted and found guilty—and Waste

9    Management's employees were charged and convicted in *People v. Morse*.  Recology's former

10   employees admitted they permitted trucks to dump waste and consume airspace at the HRL for no

11   or reduced payment.  This was a "theft" under the Policy for the same reason it was "theft" under

12   California law:  it was an "unlawful taking" which deprived Recology of money and property.

13   While not entirely clear, BRIC's position appears to be that, for a "theft" to occur,

14   Recology's employees must have received and personally benefited from the lost money or

15   property, *i.e.*, the uncollected dumping fees.  Liu Decl. Ex. D at 1-2.  Not only does the Policy

16   contain no such requirement, courts interpreting nearly identical "employee theft" insurance

17   clauses, none of which are distinguished or even cited in BRIC's claim correspondence, routinely

18   rejected this argument as will be discussed next.

19   **b.    Case Law Interpretations Of "Theft" Strongly Support Coverage**

20   In the absence of definitions of "unlawful" or "taking" in commercial crime policies,

21   district courts have turned to the relevant criminal law for guidance in construing the meaning of

22   "theft" in these policies.  See, e.g., *Guyan International, Inc. v. Professional Benefits*

23   *Administrators, Inc.*, No. 5:10 CV 823, 2013 WL 1338194, at *18 (N.D. Ohio Mar. 29, 2013).

24   The California Court of Appeal's opinion in *People v. Morse*, involving criminal proceedings

25   arising from scheme to defraud Waste Management, offers unique insight into the meaning of

26   "theft" in the context of the two schemes at issue here.  In that case, and in the underlying

27   criminal proceedings in this case, the landfill owner's employees were convicted of "grand theft"

28   of uncollected dumping fees in exchange for kickbacks under the California Penal Code.  *See*

§ C.3.c. at 8, n. 1, above.[8]  Those cases are not merely analogous, either.  They involve the application by two California courts of criminal "theft" under California law to the same unique schemes at issue here and are highly instructive.

Recent district court opinions interpreting nearly identical commercial crime policy terms also support coverage for Recology's losses.  The district court's opinion in *National Union Fire Ins. Co. v. Cargill, Inc.*, Case no. 20-cv-0839 (WMW/JFD), 2021 WL 3733028 (D. Minn. Aug. 24, 2021) ("*Cargill*") is instructive.  Similar to *Morse* and this case, *Cargill* involved an employee's scheme of defraud its employer, the insured, by selling the employer's commodities (corn and sorghum) at a reduced rate in exchange for kickbacks.  *Id*. at *1.  The total loss to the employer resulting from the scheme was $32,115,192, which included $3,115,611 in kickbacks.  Cargill also received $310 in restitution in the parallel criminal proceedings.  *Id*.  There, as here, the commercial crime policy did not define "unlawful taking."  And there, as here, the policy did not require the insured's employee to personally benefit or take the lost money or property into his or her own hands for the loss to be covered.  Nevertheless, the insurer, just as BRIC does here, argued there was no "taking" because the employee did not physically possess or control shipment of the employer's commodities—the employer did.  *Id*. at *5-6.

In rejecting this argument, the district court applied the *Black's Law Dictionary* definition of "taking," requiring only "an implicit transfer of possession or control."  *Id*. at *6.  The court concluded the dishonest employee's control over the pricing and other elements of the sale was comparable to the scope of control found sufficient to constitute a "taking" in other cases, despite the employee's lack of physical control or possession of the employer's property, *i.e.*, the commodities.  *Id*.

*Cargill* applies with particular force here.  In *Cargill*, the *insured* employer had physical possession and control of the lost property (the commodities) and ultimately delivered them into

---

[8] The ALJ (Hon. Geraldine Darrow) in Ms. Wilson's unemployment benefit proceedings reached the same conclusion:  "[T]he fact that [Ms. Wilson] allowed trucks to dump refuse without paying to do so is a ***misappropriation of the employer's property, i.e., the charges that should have been collected for the employer's benefit***."  Pinedo Decl. Ex. E at pp. 3-4 (emphasis added).  Further, Judge Darrow found the evidence of theft to be "conclusive."  *Id*. at p. 3.

1    the dishonest employee's possession and control for sale to customers.  The commodity taken

2    here (landfill space) originated at the HRL where the dishonest employees exercised their

3    exclusive control over the transaction to permit customers to dump waste and consume landfill

4    space for a reduced or no payment, depriving Recology of the full price of the commodity it sold.

5    No intervening act by the insured or anyone else was required.

6         Indeed, in rejecting the insurer's argument that a physical act was required, *Cargill*

7    observed, "[o]ther courts also have rejected similar arguments."  For instance, in *Whitney Equip.*

8    *Co. v. Travelers Cas. & Sur. Co. of Am.,* 431 F.Supp.3d 1223, 1227 (W.D. Wash. 2020), the

9    dishonest employee manipulated company data to overstate profits and trigger payment of

10   unearned bonuses to other employees.  The policy defined "theft" as "the intentional unlawful

11   taking of [m]oney…to the insured's deprivation."  *Id.* at 1226.  The court concluded the dishonest

12   employee's conduct was "theft" within the meaning of the policy.  In doing so, the court rejected

13   the insurer's argument, echoed in BRIC's coverage letters that for a "taking" to occur the

14   employee must personally receive the property or money.  *Whitney* succinctly held:  "[T]he

15   insurer promised to cover [the insured's] loss, however, not the employee's gain."  *Id.* at 1227.

16        Also instructive is another recent case:  *Sherwin-Williams Co. v. Beazley Ins. Co.*, No. 18-

17   cv-02964 (DWF/DTS), 2020 WL 4226866, at *4 (D. Minn. July 23, 2020).  The district court in

18   *Beazley* also squarely rejected the argument that a "taking" for purposes of employee theft

19   requires a physical act.  In that case, the dishonest employee's approval of inflated invoices

20   resulting in an overcharge to the insured was sufficient to constitute a "taking," despite the

21   absence of any possession or control over the money paid to the vendor.

22        Notably, the court in *Sherwin-Williams* distinguished the Minnesota court of appeals'

23   prior, unpublished 2004 decision in *Cargill, Inc. v. National Union Fire Ins. Co. of Pittsburgh*,

24   Civ. No. A03-187, 2004 WL 51671, at *14 (Minn. Ct. App. Jan. 13, 2004), which is one of the

25   primary cases the insurer relied upon to deny coverage and which is the leading case BRIC relies

26   upon here for the proposition that the employee must "seize" the subject property for there to be

27   an "unlawful taking" by the employee.  Addressing the insurer's reliance on *Cargill*, the *Sherwin-*

28   *Williams* court explained that *Cargill* was a trade secret case easily distinguishable on its facts

and addressing the issue of whether Cargill employees' alleged improper use and

misappropriation of a competitor's seeds was a "theft" under the policy.  The court explained that

in contrast to those facts, the scheme in *Sherwin-Williams* involved depriving the insured of

$3,500,000 by approving payment of inflated invoices above an agreed upon price in accordance

with "a set pricing schedule," *id.*, at *1, n.1, and "decline[d] to apply the non-binding precedent

that a 'taking' requires the act of stealing an article."  *Id.* at *4, n. 8.  The court agreed with

"others that 'taking,' for the purposes of employee theft, may be broadly construed and is not

limited to 'hands in the till' or physical control over a specific item."  *Id.*

Still another district court to reject a similar argument is *Morris Kirschman & Co., LLC v.

Hartford Fire Ins. Co.*, No. Civ. A. 03-1743, 2004 WL 1934848 (E.D. La. Aug. 30, 2004).  In

*Morris*, the court held the employee's manipulation of accounts receivable to trigger payment of

more than $200,000 in unearned bonuses and merit pay increases for employees was a "theft."

*Id.* at *1.  The court found the loss was covered as either "money" or "other property" under the

terms of the policy despite that the dishonest employee did not receive or benefit from the bonus

and pay increases to other employees.  *Id.* at *2.

### c.    "Theft" Is "Any Dishonest Act."

Not only is the dishonest employee's physical possession or control of the stolen money

or property not required for a "taking" to occur; where, as here (multiple times), a commercial

crime policy uses the phrase "theft or any other fraudulent, dishonest, or criminal act," the term

"theft" is properly construed to include any "fraudulent, dishonest, or criminal act."  Because

there is no dispute that the misconduct by Recology's former employees was, at a minimum, a

"fraudulent, dishonest, or criminal act," if not all three, the Court can and should grant this

motion for this additional reason.

The district court's opinion in *Guyan*, 2013 WL 1338194, at *19, is instructive.  In *Guyan*,

the parties filed cross-motions for summary judgment on the issue of coverage under the

"Employee Theft" provision of a commercial crime policy.  The court framed the issue as

follows:  "whether Plaintiffs' losses resulted from theft" by the insured's employee.  *Id.* at *17.

The court construed the policy as a whole, beginning with the definition of "theft."  The policy

1    defined "theft" as an "unlawful taking," but did not define "unlawful" or "taking." *Id*. at *4.

2    Thus, to assist in interpreting the meaning of "theft," the court turned to the Ohio criminal code,

3    the dictionary definitions of "unlawful" and "taking," and references to "unlawful taking"

4    elsewhere in the policy, including exclusions. *Id*. at *18-19.

5          The policy contained an exclusion from coverage for "loss due to the unlawful taking of

6    Money…***or any other fraudulent, dishonest, or criminal act***…by an authorized

7    representative…." *Id*. at *19 (emphasis added). *Guyan* held the policy's use of the term "or any

8    other" following the phrase "unlawful taking" and immediately preceding the phrase "fraudulent,

9    dishonest or criminal act" explains and equates an "unlawful taking" with a "fraudulent, dishonest

10   or criminal act." *Id*. The Court contrasted that interpretation with the scenario in which the

11   conjunctive "or" were used alone, which would suggest that fraudulent, dishonest and criminal

12   acts were alternate acts, rather than equivalent acts, to "unlawful taking." *Id*.

13         The court concluded the words used in the definition of theft—"unlawful taking"—can be

14   subject to different interpretations. That is because there was no language in the policy which

15   limits "theft" to the concept of embezzlement or the like, or which excludes coverage for

16   fraudulent or dishonest conduct resulting in the loss of client funds, and because "unlawful" and

17   "taking" were not defined by the policy. *Id*. Applying the rule resolving ambiguities against the

18   insurer who drafted the policy, the court found the term "theft" includes any "fraudulent,

19   dishonest or criminal conduct." *Id*. at *20; see also *Taylor Chrysler Dodge, Inc. v. Universal*

20   *Underwriters Ins. Co.*, Case No. 08C4522, 2009 WL 3187234, at *5 (N.D. Ill. Sept. 30, 2009)

21   (granting summary judgment in favor of insured on coverage after broadly interpreting "loss

22   resulting directly from theft" in commercial crime policy to include loss "resulting directly from

23   ***any fraudulent or dishonest act or acts committed by an employee***") (emphasis added).

24         *Guyan* is factually and legally indistinguishable from our case. Here, just as in *Guyan*, the

25   Policy defines "theft" as an "unlawful taking," but does not define the term "unlawful taking."

26   And here, just as in *Guyan*, the structure of the exclusionary clauses in the Policy—use of the

27   phrase "or any other dishonest act" immediately following the term "theft"—explains and equates

28   "theft" to a dishonest act. Exclusions D.1.b and D.1.c are anything but "conspicuous, plain and

clear," and "unambiguous" that they apply to bar coverage for loss resulting from "theft" only. Both exclusions use the phrase "or any other dishonest act" immediately following the term "theft." Both exclusions also contemplate and contain an exception for "loss resulting from theft or any other dishonest act…when covered under Insuring Agreement A.1," which is broadly construed in favor of the insured. *Richardson*, 2019 WL 2300376, at *5. Condition 2.a., which expressly applies to Insuring Agreement 1.A., also uses the phrase "'theft' ***or any other dishonest act***." (Emphasis added.) Taken together, and construed broadly in favor of coverage, as required under California law, Insuring Agreement 1.A, Condition 2.a., and Exclusions D.1.b. and D.1.c of the Policy all support coverage for "theft or any other dishonest act."

In short, the case law interpreting nearly identical policy terms have uniformly rejected BRIC's narrow interpretation of "theft" as requiring a physical act or some benefit to the dishonest employee. To the contrary, "theft" should be construed broadly in accordance with California law and the reasonable expectations of a layperson to include felony grand theft. BRIC's sweeping denial of coverage "for anything other than kickbacks" breached the Policy.[9]

### d.   At Best For BRIC, "Taking" Is Ambiguous

Federal courts have held, at the pleadings stage and on summary judgment, that a "taking," as used in its plain and ordinary sense, (1) does not require the exercise of physical possession or control of property by the employee, (2) does not require the employee to personally benefit from the lost money or property, and (3) supports a far broader interpretation

---

[9] BRIC's reliance upon an Illinois district court's one-page order in *Williams Electronics Games, Inc. v. Barry*, No. 97C3743, 2000 WL 106672, at *1 (N.D. Ill. Jan. 13, 2000), is misplaced. The policy in *Barry* did not contain the phrase "or any other dishonest act" after the word "theft." It was limited only to theft, which was defined as "the unlawful taking…of assets to the deprivation of the Insured." The court held: "because [the employee's] actions do not amount to theft as defined in the policy, the claimed loss is not covered by the…policy in question." *Id.* (emphasis added). The court distinguished the policy from crime policies that cover losses caused by "any…dishonest acts," which, under *Guyan*, the Policy here does. *Barry* only supports coverage under the Policy here. BRIC's reliance upon *Pine Belt Automotive, Inc. v. Royal Indem. Co.*, No. 06-5995 (JAP), 2008 WL 4682582 (D.N.J. Oct. 21, 2008), is equally misplaced. That case was distinguished by *Tesoro Refining & Marketing Co. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 96 F.Supp.3d 638, 647 (W.D. Tex. 2015), another case relied upon by BRIC, on the grounds that the employer's claimed loss in *Pine Belt* was the money required to reimburse a *third party* for liability incurred as a result of its employee's misconduct.

1    of employee "theft" to include "fraudulent, dishonest, or criminal conduct." *See* § C.2.c., above.

2    Recology's interpretation of the Policy is, at a minimum, reasonable, and the most that can be

3    said for BRIC's interpretation is that it, too, is reasonable, thereby creating an ambiguity.

4              **3.      Recology Lost "Money" And "Other Property" As A Result of "Theft"**

5    Insuring Agreement A.1. of the Policy is written in the disjunctive.  It covers loss of

6    "money," "securities," *or* "other property" as the direct result of "theft."  As pertinent here, the

7    Policy covers loss of (1) "money" or (2) "other property" (Recology does not allege a loss of

8    "securities"), as the result of "theft," *i.e.*, the "unlawful taking of property to the deprivation of

9    the Insured." (Emphasis added.)  As we show below, Recology lost "money" *and* "other

10   property" as a result of "theft."  Summary judgment should be granted for either reason, or both.

11             **a.      Recology Lost "Money" As A Result of "Theft."**

12   The loss to Recology as a result of the schemes was determined by Wilson Consulting—

13   the same forensic accountant who determined the $13 million loss to Waste Management as a

14   result of identical schemes by its employees at the Kirby Canyon landfill.  In both cases, the

15   amount of the loss consisted of:  (1) the amount its employees undercharged customers at the

16   reduced rate (as a result of mischaracterizing loads), and (2) the amount its employees did not

17   charge (as a result of permitting customers to bypass the scales altogether) for dumping waste at

18   the landfills and consuming valuable landfill space.  *See* Wilson Decl. ¶¶ 6-8.

19   On its face, the Policy covers loss of money resulting from an "unlawful taking of

20   property" *generally*.  Policy, § F.20.  ISO made this clear in the November 22, 2005 edition of its

21   "ISO Circular" to insurer clients when it deleted the phrase "'money', 'securities' or 'other

22   property' from the definition of "theft" in the ISO policy form BRIC used, and replaced it with

23   the generic term "property."  *Maryland Casualty Co. v. Reeder*, 221 Cal.App.3d 961, 968 (1990)

24   (ISO explanations are "of considerable assistance" in interpreting insurance policies); *Prudential-*

25   *LMI Comm. Ins. Co. v. Reliance Ins. Co.*, 22 Cal.App.4th 1508, 1513 (1994) (industry

26   publications "particularly persuasive as interpretive aids where they support coverage on behalf

27   of the insured").

28

In its "Explanation of Changes" reflected in the Commercial Crime policy form BRIC sold to Recology, ISO made clear to its members, including BRIC, that the policy form covers theft of "different kinds of property," and "thus the generic term 'property' is used" instead:

20.     "Theft"

The definition of theft is revised to remove the specific reference to "'money', 'securities' or 'other property'" in favor of the general term 'property'.  'Theft' is used in different insuring agreements covering different kinds of property, thus the generic term 'property' is used."

Pinedo Decl. Ex. F.

The Policy does not define "property," although Condition E.1.p. of the Policy, entitled "**Ownership of Property; Interests Covered**," provides, "The property covered under this policy is limited to property:  (1) *That you own* or lease; or (2) That you hold for others whether or not you are legally liable for the loss of such property."  (Boldface in original; boldface italics added.)  Construed in its plain and ordinary—and generic—sense, as intended, "property" in the context of theft is "a thing or things owned," *or* "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised."  *People v. Pak*, 3 Cal.App.5th at 1119 (citing dictionary definitions).  No distinction is made between real and personal property interests; all "property" that is unlawfully taken is covered, so long as it is owned or leased or held for others.  As mentioned, Recology's employees were indicted and found guilty of grand theft of the dumping fees they failed to collect in exchange for kickbacks.  Undeniably, Recology had the right of possession, use, and enjoyment of those fees and entitled to coverage for their loss.

The same result is warranted if the "property" taken is the landfill space Recology owns and that it—and not its employees or any third party—had the right to possess, use, and enjoy.  Under California law, an owner of real property has property rights to the surface, subsurface, and airspace.  Civ. Code § 829 ("The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it.").  The average layperson who purchases "employee theft" coverage for loss resulting from the "taking of property" therefore would reasonably expect coverage under the Policy for loss of all property they "own or lease."  When it

1    comes to the HRL, this includes all rights of possession, use, and enjoyment of the surface,

2    subsurface, and airspace.

3            As noted above, there is no genuine dispute that Recology lost money as a result of the

4    unlawful schemes or as to the amount of money it lost in uncollected dumping fees at the HRL

5    but for the unlawful schemes.  Nor is there a genuine dispute as to coverage for the loss—at least

6    insofar as it reflects the kickbacks received by Recology's former employees.  There is no basis to

7    distinguish between all uncollected dumping fees and the portion paid as kickbacks—both belong

8    to Recology—based upon whether they personally benefited or were received by the dishonest

9    employee.  *Whitney,* 431 F.Supp.3d at 1227 ("[T]he insurer promised to cover [the insured's]

10   loss, however, not the employee's gain.").

11           There is therefore no genuine dispute that all money Recology lost as a result of the

12   unlawful schemes—regardless of who benefited from them—is covered.

13           **b.      Recology Lost "Other Property" As A Result of "Theft."**

14           Separate and apart from whether Recology lost "money" as a result of "theft" of property

15   generally, it also lost "other property" as a result of theft under the Policy.  The Policy defines

16   "Other Property" as "any [1] tangible property other than 'money' and 'securities' that [2] has

17   intrinsic value."  Policy, § F.15 (brackets added).  "Tangible property" is not defined.  In

18   analyzing whether there is insurance coverage for loss or damage to "tangible property," the

19   distinction between fee simple property ownership and incorporeal property interests, such as

20   easements, makes all the difference, as the California Supreme Court has held.  *Kazi v. State*

21   *Farm Fire & Casualty Co.*, 24 Cal.4th 871 (2001) (distinction between easement creating

22   "incorporeal or intangible property right" from fee simple property ownership is "especially

23   important") (citing Civ. Code § 829).  An insured reading its policy, including Condition E.1.p.,

24   would reasonably understand real property that it owns to be "tangible property."  *Thee*

25   *Sombrero, Inc. v. Scottsdale Ins. Co.*, 28 Cal.App.5th 729, 738 (2018) (owner of real property

26   "plainly has an interest in tangible property").  Insofar as BRIC's claims professionals have a

27   different interpretation of "tangible property" that is reasonable under the circumstances, at best

28

1  for BRIC, there is an ambiguity and Recology's interpretation prevails. *Minkler v. Safeco Ins.*

2  *Co.*, 49 Cal.4th 315, 321 (2010).

3       As noted above, unused permitted landfill space at the HRL is finite and valuable.  At

4  some point all the space will be consumed and the HRL will no longer accept waste material and

5  must begin the process of permanently closing.  *See* § C.3.a., above.  For that reason, each cubic

6  yard of permitted landfill space at the HRL has intrinsic value in the amount of the price set for

7  the disposal of waste at the HRL.  Wilson Decl. ¶ 10.

8       Thus, whether analyzed as a loss of "money" (the lost dumping fees) or "other property"

9  (unused permitted landfill space) as a result of "theft," the end result is the same:  Recology's loss

10  is covered by the Policy.  BRIC's remedy was (and is) to recoup its loss through subrogation, just

11  as National Union did when it covered and paid Waste Management for its loss without putting it

12  to the trouble of filing a coverage lawsuit.

13       To spend the next several months conducting fact and expert discovery in search of

14  different facts, as if the lengthy and expensive investigations culminating in several hundred

15  pages of evidence in the Proofs of Loss **had not** occurred, that BRIC **had not** already interviewed

16  everyone it believed it needed to, that Recology's former employees **had not** already confessed,

17  been indicted and been found guilty to grand theft, and that BRIC **had not** acknowledged having

18  no dispute with Recology's loss calculations, would defeat the purpose of summary judgment.

19       **E.   CONCLUSION**

20       Based on the foregoing, Recology respectfully requests the Court grant summary

21  judgment in favor of Recology and against BRIC.

22  Dated: September 29, 2022

                                    PINEDOLAW
23

24
                        By    _____
25                                        /s/ Craig A. Pinedo
                                          CRAIG A. PINEDO
26
                                    Attorneys for Plaintiff
27                                  RECOLOGY INC.

28