UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RECOLOGY, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>BERKLEY REGIONAL INSURANCE COMPANY,<br><br>        Defendant. | Case No. 20-cv-01150-PJH<br><br>**ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 90, 94 |

Plaintiff's and defendant's respective motions for summary judgment or partial summary judgment came on for hearing before this court on January 12, 2023. Plaintiff appeared through its counsel, Craig Pinedo. Defendant appeared through its counsel, Michael Keeley. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

## BACKGROUND

This is an insurance coverage dispute. Plaintiff Recology, Inc. ("Recology"), is a San Francisco-based resource recovery company that collects, sorts, and processes waste materials. Defendant Berkley Regional Insurance Company ("BRIC") is an Iowa-based insurance company.

**A.    Hay Road Landfill**

Recology owns and operates the Hay Road Landfill ("HRL") located in Vacaville, California, approximately 12 miles south of Dixon in Solano County. Lyons Decl. ¶ 2 (Dkt. 90-4 at 2). The HRL is comprised of 640 acres, approximately 260 of which are

1  permitted as Class II landfill.  Id. ¶ 6 (Dkt. 90-4 at 2–3).  Recology incurred millions of
2  dollars in capital costs to purchase the HRL and obtain and renew the necessary licenses
3  and permits to operate the HRL as a landfill.  Id. ¶ 5 (Dkt. 90-4 at 2).  As a condition of its
4  purchase of the HRL, Recology assumed substantial closure and post-closure
5  maintenance costs and contingent liabilities for any harm to the environment as a result
6  of its operations at the HRL or its closure and post-closure activities.  Id.  (Dkt. 90-4 at 2).
7  　　　　The commodity Recology sells as the owner and operator of the HRL is landfill
8  space in a facility zoned and permitted to accept and dispose of waste debris.  Wilson
9  Decl. ¶ 9 (Dkt. 90-2 at 3).  The unused permitted landfill space at the HRL is finite and
10 valuable.  Id. ¶ 10 (Dkt. 90-2 at 3).  Recology charges customers to dump waste in the
11 HRL based on the waste density of the debris, measured in pounds per cubic yard,
12 among other factors.  Id. ¶ 9.  The pricing is based in substantial part on the finite nature
13 of the landfill—as generally explained by plaintiff's expert, "the higher the waste density,
14 the lower the price, because higher waste density debris consumes less of the permitted
15 landfill space per pound of debris . . . For that reason, Recology charges more for lower
16 density 'general debris' because it is less dense and therefore consumes more permitted
17 landfill space per ton."  Id. ¶ 9.  The price charged for dumping is thus based in part on
18 the weight of the load dumped by each truck as well as the classification of the waste.
19 Waste characterized as "CNASP" (i.e., concrete and asphalt) is the most dense and
20 cheapest to dump, while it is more expensive to dump waste classified as "general
21 debris" at the HRL.  Id. ¶ 8.
22 **B.    The Policy**
23 　　　　In 2009, Recology purchased its first Commercial Crime policy from BRIC, and the
24 company renewed the Commercial Crime policy every year.  Lyons Decl. ¶ 3 (Dkt. 90-4
25 at 2).  Recology purchased Commercial Crime policy no. BCR-70000130-14, with a
26 policy period from October 1, 2014, to October 1, 2015 (the "policy").  Lyons Decl., Ex. A
27 (Dkt. 90-4 at 6–51). The policy provides $5 million in limits "per occurrence" and contains
28 a $25,000 deductible "per occurrence."  Id.  The policy is based on the Insurance

Services Office, Inc. ("ISO") Standard Form CR 00 22 (version 05 06).  Id.

Insuring Agreement A.1. of the Policy, entitled "Employee Theft," provides:

> Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations and applies to loss that you sustain resulting directly from an "occurrence" taking place at any time which is "discovered" by you during the Policy Period shown in the Declarations or during the period of time provided in the Extended Period To Discover Loss Condition E.1.j.:
>
> 1. Employee Theft
> We will pay for loss of or damage to "money," "securities" and "other property" resulting directly from "theft" committed by an "employee," whether identified or not, acting alone or in collusion with other persons. For the purposes of this Insuring Agreement, "theft" shall also include forgery.

Lyons Decl., Ex. A (Dkt. 90-4 at 11).

The Policy defines "theft" as "the unlawful taking of property to the deprivation of [Recology]." Policy, § F.20 (Dkt. 90-4 at 22).  The policy includes the following condition, discussed more in depth below: "Ownership Of Property; Interests Covered The property covered under this policy is limited to property: (1) That you own or lease; or (2) That you hold for others whether or not you are legally liable for the loss of such property."  Policy, § E.1.p. ("Condition p.") (Dkt. 90-4 at 18).  Moreover, the policy provides the following relevant definition: "'Other property' means any tangible property other than 'money' and 'securities' that has intrinsic value.  'Other property' does not include computer programs, electronic data or any property specifically excluded under this policy."  Policy, § F.15 (Dkt. 90-4 at 22).

**C.    The Employee Schemes**

Recology submitted two related claims under the policy, alleging that certain employees allowed customers to dump waste at the HRL, either for no payment or reduced payment to Recology in exchange for kickbacks to the employees.  Lyons Decl. ¶ 2 (Dkt. 90-4 at 2); Ex. D (Dkt. 90-4 at 60–80); Ex. E (Dkt. 90-4 at 81–96).

First, Recology claims former employee, Toby Soares, conspired with waste broker, James Lucero, to allow Lucero to dump waste at the HRL either without paying

3

for it or by paying to dump waste at a reduced cost in return for kickbacks of $50 or $100 (the "Lucero Scheme"). Dkt. 90-4 at 60–80. More specifically, Soares conspired with Lucero to either (1) permit trucks to *bypass* the weigh station and dump their waste loads into the landfill without payment, or (2) *misclassify* general debris loads as the denser and cheaper CNASP loads. Id. Recology learned of the Lucero Scheme in the course of a law enforcement investigation in September 2015. Lyons Decl. ¶ 8 (Dkt. 90-4 at 3). The company was instructed by law enforcement not to change its practices or procedures in order not to jeopardize the investigation. Id. ¶ 9 (Dkt. 90-4 at 3). Soares confessed to his role in the scheme in an interview with the Solano County District Attorney's office in which Ross Wilson, Recology's expert, participated, but Soares apparently was not prosecuted due to the expiration of the applicable statute of limitations. Wilson Decl., Ex. B (Dkt. 90-2 at 15); Dkt. 90 at 13, n.2.

Second, Recology claims other former employees engaged in a scheme whereby they allowed customers to similarly dump waste without payment in return for kickbacks ranging from $200 to $600, depending upon the timeframe and size of the load (the "Weighmaster Scheme").[1] Dkt. 90-4 at 81–96. Recology learned of the Weighmaster Scheme from a confidential informant in August 2015, and law enforcement soon took over investigation of the scheme. Lyons Decl. ¶ 11 (Dkt. 90-4 at 4). The company was instructed by law enforcement not to change its practices or procedures in order not to jeopardize the investigation. Rowe Decl. ¶ 4 (Dkt. 90-1 at 2). The two employees involved in the Weighmaster Scheme were indicted by a grand jury on 38 counts of felony grand theft in violation of Section 487(a) of the California Penal Code, in that "said defendant did unlawfully take money and personal property of a value exceeding . . . $950, to wit Money/Cash the property of Recology." Wilson Decl., Ex. D (Dkt. 90-2 at 21–33). Both of the employees pleaded nolo contendere to charges of grand theft for their

---

[1] The scheme that is now described as the "Weighmaster Scheme" was initially referred to as the "Brazilian Scheme" in Recology's description of loss and much of the parties' subsequent correspondence. See Dkt. 90-4 at 86.

4

roles in the scheme. Pinedo Decl. ¶ 3, Ex. B (Dkt. 90-5 at 6–24).

### D. BRIC's Denial

On September 30, 2015, Recology gave notice of two claims under the policy: (1) the "Lucero Claim" (Claim No. 1897) and (2) "Weighmaster Claim" (Claim No. 1898). Lyons Decl. ¶ 14 & Ex. B (Dkt. 90-4 at 5; 52–56). BRIC acknowledged receipt of the claims on October 1, 2015. Id., Ex. C (Dkt. 90-4 at 57–59). Recology submitted an amended proof of loss dated October 28, 2016, seeking $1,769,288.22 as a result of the Lucero Scheme, and a proof of loss dated November 28, 2016, seeking $784,106.73 as a result of the Weighmaster Scheme. Lyons Decl. ¶ 13 (Dkt. 90-4 at 5). Such amounts represent unrealized revenue in dumping fees Recology believes it would have received but for the two schemes. Lyons Decl., Ex. D (Dkt. 90-4 at 60–80), Ex. E (Dkt. 90-4 at 81–96).

On November 17, 2017, two years after Recology gave notice of its claims and following substantial correspondence between insurer and the insured, BRIC provided Recology with its "preliminary" coverage analysis. Liu Decl., Ex. C (Dkt. 90-3 at 23–29). BRIC denied coverage for Recology's lost revenues, but the insurer did not rule out coverage for the kickbacks that Recology could prove were collected by the former employees. Id. (Dkt. 90-3 at 26). On December 22, 2017, BRIC sent another letter purporting to "reiterate and further explain [its] coverage position in connection with the above two matters [i.e., the Lucero Claim and Weighmaster Claim]." Id., Ex. D (Dkt. 90-3 at 30–39). In the December 22 letter, BRIC's counsel wrote, "the only loss covered by the Policy is the amount of kickbacks received by Recology's former employees." Id. (Dkt. 90-3 at 34).

### E. Procedural History

The February 13, 2020, complaint enumerates three causes of action:

1. Declaratory relief – Recology asks for a judicial declaration of the rights, duties, and obligations of BRIC related to the insurance policy;
2. Breach of contract – Recology alleges BRIC breached the policy by denying

5

     coverage; and

   3. Breach of the covenant of good faith and fair dealing – Recology alleges BRIC breached the covenant by consciously and unreasonably denying coverage without thoroughly investigating the claim for coverage.

Dkt. 1.

  Recology now moves for summary judgment or partial summary judgment in its favor on each of the following issues: (1) Recology is entitled to coverage under the policy and an award of $1,769,288.22 on its Lucero Scheme breach of contract claim; (2) Recology is entitled to coverage under the policy and an award of $784,106.73 on its Weighmaster Scheme breach of contract claim; and (3) no policy exclusion applies to Recology's claims. Recology does not move for judgment on the covenant of good faith claim.

  BRIC, on the other hand, moves for summary judgment or partial summary judgment on the following issues: (1) there is no coverage existing under a commercial crime policy BRIC issued to Recology for Recology's alleged lost revenue or airspace; (2) Recology's multiple claims constitute a single occurrence under the policy; and (3) BRIC did not act in bad faith.

## DISCUSSION

### A. Legal Standard

  Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. "A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989) (citation omitted).

Courts recognize two ways for a moving defendant to show the absence of genuine dispute of material fact: (1) proffer evidence affirmatively negating any element of the challenged claim and (2) identify the absence of evidence necessary for plaintiff to substantiate such claim. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.")

"Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or by the depositions, answers to interrogatories, and admissions on file, come forth with specific facts to show that a genuine issue of material fact exists." Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993). "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." Id.

The court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. See Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014); Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). However, when a non-moving party fails to produce evidence rebutting defendants' showing, then an order for summary adjudication is proper. Nissan Fire, 210 F.3d at 1103 ("If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment.")

**B.   Analysis**

    **1.   Interpretation of the Policy**

There is no dispute that California law applies in this diversity case. Under California law, the "interpretation of an insurance policy is a question of law" to be

answered by the court.  Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 18 (1995).  The "goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions."  Minkler v. Safeco Ins. Co., 49 Cal. 4th 315, 321 (2010) (quoting Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264 (1992)).  To do so, the court must "look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it."  Waller, 11 Cal. 4th at 18; see also Cont'l Cas. Co. v. City of Richmond, 763 F.2d 1076, 1080 (9th Cir. 1985) ("The best evidence of the intent of the parties is the policy language.").  Generally, if the policy terms are clear and explicit, their ordinary and popular interpretation governs.  Minkler, 49 Cal. 4th at 321.  But if the terms are ambiguous or susceptible to more than one reasonable interpretation, the court must "give effect to the insured's objectively reasonable expectations."  Kavruck v. Blue Cross of Cal., 108 Cal.App.4th 773, 780 (2003).  "Courts will not strain to create an ambiguity where none exists," however.  Waller, 11 Cal. 4th at 18–19.  Coverage grants are "interpreted broadly so as to afford the greatest possible protection to the insured."  MacKinnon v. Truck Ins. Exch., 31 Cal.4th 635, 655 (2003).  On the other hand, "exclusionary clauses are interpreted narrowly against the insurer."  Id. (internal quotations and citation omitted).

Here, the parties dispute whether Recology has met its burden of demonstrating claim coverage.  BRIC does not dispute that Recology lost money, that the loss was discovered during the policy period, or that the persons involved in the two schemes were employees.  The issues that remain are whether the former employees' conduct constituted theft and whether their conduct directly caused Recology's losses.

### a. Theft

The relevant portion of the policy specifies under the header "employee theft" that BRIC "will pay for loss of or damage to 'money,' 'securities' and 'other property' resulting directly from 'theft' committed by an 'employee.'"  Policy, § A.1 (Dkt. 90-4 at 11).  The policy in turn defines "theft" as "the unlawful taking of property to the deprivation of [Recology]."  Policy, § F.20 (Dkt. 90-4 at 22).  Further, the policy defines "other property"

as "any tangible property other than 'money' and 'securities' that has intrinsic value. 'Other property' does not include computer programs, electronic data or any property specifically excluded under this policy." Policy, § F.15 (Dkt. 90-4 at 22).

Plaintiff argues that the two schemes of its former employees constitute theft within the scope of the policy because the employees took a finite resource belonging to the company and gave it to customers with minimal or no payment in return.

Defendant argues that the employee schemes underlying plaintiff's lost revenues do not fall within the policy's definition of "theft." BRIC advances that the employee schemes do not amount to theft of Recology's money because the funds were never paid to Recology and thus never possessed to be taken. The insurer argues further that the employee schemes do not amount to theft of Recology's landfill space because "airspace" is not tangible and is thus outside the definition of "other property" covered by the policy. Because the term "taking" is not defined by the policy, case law interpretations of similar employee theft policies are relevant.

The matter of National Union Fire Ins. Co. v. Cargill, Inc., Case no. 20-cv-0839 (WMW/JFD), 2021 WL 3733028 (D. Minn. Aug. 24, 2021) ("Cargill"), a case cited by both parties, involved interpretation of a strikingly similar employee theft policy. The scheme there involved an employee's sale of commodities (corn and sorghum) belonging to his employer, the insured, at a reduced rate in exchange for kickbacks. Id. at *1. There, as here, the insured's commercial crime policy defined "theft" in part as an "unlawful taking" but did not define "taking" further. The insurer made the same argument that BRIC does here—that there was no taking because the employee never possessed any property belonging to the insured company. The district court in Cargill rejected this argument, instead applying the Black's Law Dictionary definition of taking, which requires only "an implicit transfer of possession or control." Id. at *6. The court concluded the dishonest employee's control over the pricing and other elements of the sale constituted a "taking" despite the employee's lack of physical control or possession of the employer's property. Recology avers that this reasoning is analogous to the circumstances here, only instead

of corn and sorghum, the commodity transferred and controlled by the former employees was the landfill space for which Recology was deprived full price.

In <u>Whitney Equip. Co. v. Travelers Cas. & Sur. Co. of Am.</u>, 431 F.Supp.3d 1223, 1227 (W.D. Wash. 2020), another district court considered coverage of an employee theft policy in which a dishonest employee manipulated company data to overstate profits and trigger payment of unearned bonuses to other employees. The policy defined "theft" as "the intentional unlawful taking of [m]oney . . . to the insured's deprivation." <u>Id.</u> at 1226. The court concluded the dishonest employee's conduct was "theft" within the meaning of the policy even where the employee did not herself possess the company's losses, and the court noted, "[T]he insurer promised to cover [the insured's] loss, however, not the employee's gain." <u>Id.</u> at 1227.

In <u>Sherwin-Williams Co. v. Beazley Ins. Co.</u>, No. 18-cv-02964 (DWF/DTS), 2020 WL 4226866, at *4 (D. Minn. July 23, 2020), another district court also squarely rejected the argument that a "taking" for purposes of employee theft requires a physical act. In that case, the dishonest employee's approval of inflated invoices resulting in an overcharge to the insured was sufficient to constitute a "taking," despite the absence of any possession or control over the money paid to the vendor. <u>Id.</u> at *4. The court agreed with "others that 'taking,' for the purposes of employee theft, may be broadly construed and is not limited to 'hands in the till' or physical control over a specific item." <u>Id.</u> at *4, n.8.

Each of the policies considered in the cases above provided for employee theft coverage using nearly identical language to BRIC's policy in this case. Though BRIC emphasizes the distinction between "employee theft" and "employee dishonesty" coverage, each of these cases was analyzed pursuant to "employee theft" provisions. Each of the policies considered in the cases above defined "theft" as an "unlawful taking" in the same way as BRIC's policy in this case. And each insurer in the cases above argued that the employees' dishonest conduct did not constitute theft because they had not "taken" the insured's money or property, just as BRIC argues here. The court agrees

with the other courts that the insurer's argument is unavailing. If the policy is given a fair, reasonable, and sensible interpretation, the former Recology employees did not have to physically possess the company's money for their acts to constitute a taking.

The definition of "taking" relied on by the courts above is helpful in assessing the former employees' schemes under the policy. The court in Cargill and the parties here all refer to the definition of "taking" from Black's Law Dictionary, "[t]he act of seizing an article, with or without removing it, but with an implicit transfer of possession or control." Black's Law Dictionary 1682 (10th ed. 2014). The employee schemes here involved the control of pricing and access to the landfill, including through negotiating with a waste broker or truck driver and maintaining or omitting records of the improper dumps. This is the same exercise and transfer of control determined to constitute a taking in both Cargill and Whitney. Cargill, 2021 WL 3733028, at *5–6; Whitney, 431 F. Supp. 3d at 1225. The employee schemes here, permitting unticketed and/or misclassified dumping at the HRL moreover effectively seized space in the landfill. The former employees did not remove anything from the HRL, but they effectively seized the finite real property through permitting occupation and transferring control over the property. This is made more salient through review of the product sold by Recology. The company deals in finite landfill space, charging customers by the weight and density for the waste they dump in the space. Wilson Decl. ¶¶ 9–10 (Dkt. 90-2 at 3).[2] The landfill space falls within the policy's definition of "other property" where it is tangible real property (especially when filled with waste), and *it has intrinsic value*. It is not the "airspace" that has been taken; rather, it is the improper transfer of Recology's real property for occupation. It is not necessary to establish a universally accepted definition of "tangible property" to interpret the policy—the issue is "whether an insured, reading his or her policy, would understand 'tangible property'" to include the property at the heart of the coverage dispute to be

---

[2] Though defendant objects to paragraph 9 of the Wilson Declaration, the objection is overruled. BRIC objects on the basis that Wilson is not qualified to opine as to whether landfill space is a "commodity," but this paragraph more broadly describes the revenue generation and accounting for Recology's business, not opinion material.

tangible. Thee Sombrero, Inc. v. Scottsdale Ins. Co., 28 Cal.App.5th 729, 738 (2018) (noting that "[d]irt is tangible" and finding that even a leasehold constitutes a tangible property interest). Given that Recology deals in landfill space, it is reasonable for the insured to understand the policy's "other property" to cover its landfill space. The consumption of valuable landfill space without payment resulted in an implicit, if not outright explicit, transfer of possession or control of the space to the deprivation of Recology. The former employees exercised their exclusive control over transactions to permit customers to dump waste and consume landfill space for reduced or no payment, depriving Recology of the full price of the commodity it sold. This constitutes a taking.

Indeed, if the policy terms are given their fair, reasonable, and sensible construction, the employees' conduct constituted theft. Contrary to BRIC's strained hypothetical, the facts here do not support a conclusion that the schemes constituted a temporary trespass to property. This point is only reinforced in light of the grand jury indictments and convictions of the former employees for "grand theft." Pinedo Decl., Ex. B (Dkt. 90-5 at 6–24). Grand theft is committed when "the money, labor, or real or personal property taken is of a value exceeding nine hundred fifty dollars ($950)." Cal. Penal Code § 487(a). Though the indictments and criminal pleas of the former employees are not dispositive on this front, they demonstrate the reasonableness of the conclusion that the employees' permission of illegal dumping in Recology's landfill constituted the theft of real property.

Before concluding, it is important to note another lesson from the cases cited above. The policy at issue here, like those at issue in Cargill and Whitney, covers the insured's loss, not the employee's gain. Cargill, 2021 WL 3733028, at *5 (citing Whitney, 431 F. Supp. 3d at 1227). BRIC concedes Recology suffered losses as a result of the former employees' schemes, but the insurer avers that coverage only extends to the amount of provable kickbacks received by the former employees. The insurer agreed to cover Recology's losses, not the employees' gains, and the unlawful taking of Recology's property is not properly measured through quantification of kickbacks. The proper

12

1    measure of Recology's losses is discussed separately, below.

2        **b.**   **Resulting Directly From**

3       The parties additionally dispute whether the losses Recology sustained were the

4    direct result of the two employee schemes.  Like the term "taking," discussed above, the

5    term "direct" is not defined within the policy.  The term's ordinary and popular

6    interpretation governs.  Minkler, 49 Cal.4th at 321.  Black's Law Dictionary defines

7    "directly" as "[i]n a straightforward manner," "[i]n a straight line or course," or

8    "[i]mmediately."  Black's Law Dictionary 557 (10th ed. 2014).

9       In Vons, a case relied on heavily by BRIC, the insured was a retail grocery store.

10   Vons Cos. Inc. v. Fed. Ins. Co., 212 F.3d 489, 490 (9th Cir. 2000).  One of its employees

11   improperly diverted products to another entity, Premium Sales Co., which defrauded its

12   investors.  Id. at 490.  The Premium investors sued the entity for the fraud, and they

13   additionally named Vons in the suit for its failure to supervise its employee.  Id. at 491.

14   Vons settled with the investors, then it sought coverage under its employee dishonesty

15   policy, but the Ninth Circuit held that the insurer was off the hook because Vons had not

16   suffered a direct loss as required by the policy.  Id. at 491 ("'direct' means 'direct'").  The

17   court determined, "Under the insuring clauses, Vons is covered only for direct losses to

18   Vons caused by its employee's dishonesty, not for vicarious liability for losses suffered by

19   others arising from its employee's tortious conduct."  Id. at 490.

20      Recology argues that its losses were the direct result of the two employee

21   schemes because there was no intervening cause.  BRIC disagrees.  BRIC argues that

22   Recology did not directly lose money or other property as a result of the alleged taking of

23   airspace, and it is a loss "directly resulting from" employee theft that is covered.  The

24   insurer posits, "Recology either suffered a loss of 'money' before the waste was dumped

25   when the Recology employees allowed the truck to pass without tare weight, or

26   misclassified the load; or it suffered a loss of 'money' after the waste was dumped when

27   they failed to collect the dumping fees.  Regardless, no loss of 'money' occurred at the

28   time the waste was dumped and the airspace was occupied."  Dkt. 93 at 30.

Here, BRIC's argument mischaracterizes the loss to Recology. As discussed above, Recology suffered a loss of its specialized landfill space, its real property, not simply money or airspace. The employee schemes immediately led to the loss of plaintiff's landfill property where the physical space was taken without compensation upon each dumping. Unlike the circumstances in Vons, Recology's loss of property for which it is legally liable is direct—there is no vicarious liability or any other intervening consideration between the employees' conduct and the company's losses. Accordingly, the Recology's loss resulted directly from the employee theft.

In sum, Recology suffered a loss of its real property resulting directly from theft committed by its former employees, a loss that falls within the boundaries of coverage under the policy.

### 2. Application of a Policy Exclusion

Defendant "bears the burden of bringing itself within a policy's exclusionary clauses" which are to be "strictly construed." HS Services, Inc. v. Nationwide Mut. Ins. Co., 109 F.3d 642, 645 (9th Cir. 1997). Exclusions are to be "subjected to the closest possible scrutiny and judged from the perspective of an average layperson." Haynes v. Farmers Ins. Exch., 32 Cal. 4th 1198, 1212 (2004) (internal quotation marks and citations omitted).

BRIC argues Recology's uncollected landfill fees are not covered because they were not "owned, leased, or held" by Recology as is required by the limitation of coverage under Condition p. Dkt. 90-4 at 18. However, as discussed above, it was not the unpaid landfill fees that were unlawfully taken from Recology, it was the finite and valuable real property owned by Recology that was the subject of the employee theft. Condition p. accordingly does not apply to preclude coverage.

Further, as Recology notes, a reasonable policy holder would not interpret Condition p. to function as a policy exclusion. The "Conditions" section of the policy is not where any layperson would expect to find a limitation or exclusion of coverage; instead, a limitation or exclusion should be included in the "Limit of Insurance" (section B)

14

1  or "Exclusions" (section E) sections of the policy.  A layperson reading the policy would
2  not interpret Condition p. to take away coverage where it was expressly granted by
3  Insuring Agreement A.1.  An exclusion that purports to apply except when it does not
4  apply is hardly enforceable.

5  Alternatively, BRIC argues that Exclusion D.1.c applies.  Exclusion D.1.c. excludes
6  "Loss resulting from 'theft' or any other dishonest act committed by any of your
7  'employees', . . . except when covered under Insuring Agreement A.1."  Dkt. 90-4 at 12.
8  BRIC argues that this exclusion applies on the basis that the employees did not commit
9  theft under the terms of Insuring Agreement A.1.  BRIC is incorrect for the reasons
10 described above: the employees committed theft under the terms of the policy.

11 In sum, BRIC fails to carry its burden to establish that any policy exclusion applies
12 to preclude coverage for employee theft.

### 3. Damages

"To survive a motion for summary judgment, a nonmoving party must present 'evidence from which a reasonable jury could return a verdict in its favor.'" Stephens v. Union Pac. R.R. Co., 935 F.3d 852, 854 (9th Cir. 2019) (citations omitted).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citation omitted).  "'[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence.'" Arandell Corp. v. Centerpoint Energy Servs., Inc., 900 F.3d 623, 628–29 (9th Cir. 2018) (citation omitted).

Recology submitted an amended proof of loss dated October 28, 2016, seeking $1,769,288.22 as a result of the Lucero Scheme, and a proof of loss dated November 28, 2016, seeking $784,106.73 as a result of the Weighmaster Scheme.  Lyons Decl. ¶ 13 (Dkt. 90-4 at 5). Such amounts represent unrealized revenue in dumping fees Recology believes it would have received but for the two schemes.  Lyons Decl., Ex. D (Dkt. 90-4 at

1  60–80), Ex. E (Dkt. 90-4 at 81–96).

2  BRIC disputes the amount of Recology's alleged loss. Specifically, the insurer
3  states,

> BRIC has identified disputes with Recology's methodology for computing its alleged loss, which have been extensively outlined by BRIC's expert. (Keeley Dec., Ex. 9). Because a genuine issue of material fact exists as to the amount of Recology's loss, Recology is not entitled to summary judgment on this issue.

7  Dkt. 93 at 31. BRIC only refers generally to the declaration of its expert, and the insurer
8  does not specify what facts are established by the expert or how they contradict the facts
9  advanced by Recology's expert. See Hagarty Decl. (Dkt. 93-10). The insurer did not
10 dispute the methodology before now and previously took the position that Recology's
11 claimed losses were not covered by the policy. Manogue Decl., ¶ 5 (Dkt. 93-8 at 3).
12 Defendant and its representatives instead calculated the losses as the provable amount
13 of kickbacks received by the employees. Id., ¶¶ 11–12 (Dkt. 93-8 at 10–12). But
14 defendant's position is unsupportable—as noted above, "the insurer promised to cover
15 [the insured's] loss, however, not the employee's gain." Whitney, 431 F. Supp. 3d at
16 1227.

17 On reply, plaintiff emphasizes that BRIC had at no point before now disputed
18 Recology's losses or the methodology underlying the sworn statements of loss.
19 Recology argues that this lack of dispute regarding the methodology and the lack of any
20 reference to specific facts in the record leaves BRIC short of creating a dispute of
21 material fact. Recology is correct in its assessment that defendant does little to create
22 doubt regarding the material facts. BRIC only generally and briefly cites to the
23 declaration of its competing expert, and the insurer does not include in its brief any
24 reference to a fact rebutting plaintiff's calculations of loss.

25 However, the court finds that Recology fails to establish that it is entitled to
26 judgment as a matter of law regarding its damages calculations. The statements of loss
27 represent estimates regarding the amount of revenue Recology should have collected but
28 for the illegal employee dumping schemes. See, e.g., Dkt. 103 at 24–186 (explaining

1  Wilson's methodology of calculating loss to Recology as the weight of an unpaid bypass
2  load times the tonnage of the load captured via secret scale).  Notwithstanding
3  defendant's rather skimpy factual showing, it has consistently argued against plaintiff's
4  damages claims.  Given that the expert discovery deadline has not passed and that the
5  parties intend to pursue more expert discovery before trial (see Dkt. 106, Dkt. 107), the
6  court finds that summary judgment is not warranted and that a more complete record will
7  enable a just and fair damage determination.  Therefore, neither side is entitled to
8  judgment on the issue of damages as a matter of law, and the quantum of damages shall
9  be submitted to a jury.

### 4. Breach of Covenant of Good Faith and Fair Dealing

"There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.  This principle is applicable to policies of insurance." Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1158 (9th Cir.2002) (citing Comunale v. Traders & General Ins. Co., 50 Cal.2d 654 (1958)) (internal quotation marks omitted). "The responsibility of the insurer to act in good faith 'is not the requirement mandated by the terms of the policy itself' but is imposed by law, breach of which sounds in tort notwithstanding that the denial of benefits may also constitute breach of the contract." Id. (citing Gruenberg v. Aetna Ins. Co., 9 Cal.3d 566 (1973)).  As the California Supreme Court explained,

> "The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. . .  On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably."

Wilson v. 21st Century Ins. Co., 42 Cal.4th 713, 724 (2007), as modified (Dec. 19, 2007) (quoting Amadeo, 290 F.3d at 1161–62.)

Defendant argues that it did not breach the covenant because its denial of

17

1  coverage for the alleged loss of anticipated revenue was maintained in good faith and on
2  reasonable grounds.  Defendant avers that its good faith was demonstrated through
3  several actions, including: (1) it thoroughly investigated the claims, (2) it indemnified
4  Recology for the provable kickbacks, and (3) it stated that it is willing to pay more for the
5  amount of kickbacks that Recology is able to prove.

   Plaintiff counters that BRIC fell short of industry standards and breached the
7  covenant of good faith by both failing to thoroughly investigate the claim and by
8  compelling Recology to litigate the issue of coverage despite that a plain reading of the
9  policy should result in coverage.  Despite the charging, prosecution, and conviction of the
10 former employees for "grand theft," BRIC still has not revisited its coverage
11 determination.  Recology avers that BRIC violated its duty of good faith by focusing only
12 on grounds to justify denial of the claim.

   Here, defendant has the better argument.  As noted at the hearing, the court finds
14 that there exists a genuine dispute regarding coverage, and that defendant's denial was
15 not unreasonable under the circumstances.  The court's acceptance of plaintiff's
16 arguments in favor of coverage does not mean that they were a slam dunk.  Nor is the
17 court's finding of coverage synonymous with a finding that defendant acted
18 unreasonably.  Indeed, though BRIC's rationale for doing so is difficult to square with its
19 denial position, the insurer's actions to compensate Recology for the provable amounts of
20 kickbacks demonstrate some modicum of good faith, particularly since it did so based on
21 some out-of-district case authority.  See Liu Decl., Ex. D (Dkt. 90-3 at 31) (Keeley
22 correspondence denying coverage, citing Tesoro Ref. & Mktg. Co. LLC v. Nat'l Union Fire
23 Ins. Co., 96 F. Supp. 3d 638, 647 (W.D. Tex. 2015)).  Therefore, the court GRANTS
24 defendant's motion for partial summary judgment as to plaintiff's final claim for breach of
25 the covenant of good faith and fair dealing.

## CONCLUSION

27 For the reasons stated above, the court concludes as follows:
28 • Recology suffered a loss of its real property resulting directly from theft committed by

- its former employees, a loss that falls within the boundaries of coverage under the policy.  No policy exclusion applies.  The court GRANTS summary adjudication on this issue in favor of plaintiff and DENIES summary adjudication on this issue against defendant.
- Recology has not established the quantum of its losses as a result of the employee theft schemes.  The court DENIES summary adjudication on this issue, and this issue shall be tried before a jury.
- BRIC's denial of coverage was the result of a genuine dispute regarding policy interpretation, not the result of bad faith.  The court GRANTS defendant's motion for partial summary judgment as to plaintiff's final claim for breach of the covenant of good faith and fair dealing.

**IT IS SO ORDERED.**

Dated: January 27, 2023

*/s/ Phyllis J. Hamilton*
PHYLLIS J. HAMILTON
United States District Judge